## No. 5435.

### JUSTUS FRANCKE VS. HIS WIFE.

In a suit for interdiction the fullest investigation into the motives of the plaintiff will be allowed.

In passing on the issue of interdiction, the court will not be controlled by the opinions of experts, but giving to them a respectful consideration, and to every fact bearing on the issue its legitimate weight, will form, and decree its own conclusions.

Mere weakness of mind in the defendant will not justify a decree of interdiction, when in view of all the evidence adduced, such decree is not necessary either for the protection of the defendant's property, or person, or of society,

APPEAL from the Second District Court, parish of Orleans.   *Tissot,*
J.

*T. Gilmore & Sons,* and *J. L. Tissot,* for plaintiff and appellee.

*Gustave A. Breaux,* for defendant.

The opinion of the court was delivered by

MANNING, C. J.   Justus Francke seeks the interdiction of his wife, née Pauline Landreaux, for habitual imbecility and insanity.

Their marriage was in 1855.   In the following year the wife was de-livered of a still-born child.   In 1857, at the birth of a daughter, she had puerperal convulsions and epileptic fits (attaques d'éclampsic).   She re-covered, and five more children were born, all of whom survive, and are well formed, and present no trace of constitutional infirmity.   In 1862 the symptoms of mental disturbance appeared, producing irregular and

singular conduct, which increased during the following year to such an extent that her mother urged her husband to have her cared for. Medical aid was interposed in 1868, and she was sent to the asylum for the insane in 1869. She was released from that place by a writ of habeas corpus at the instance of her mother in 1870, and has remained under her care ever since. This action was instituted in January, 1876.

The first answer, filed in February, was merely formal, but in May it was supplemented by another, alleging that the wife had instituted against the husband a suit for divorce, prior to his petition for her interdiction, and that the interdiction was sought only to prevent the divorce—that her mental trouble was caused by the cruel treatment of her husband, whose criminal connection with a concubine under the marital roof was neither concealed from her nor her friends, and that through the care and kind attentions of those friends she had now sufficiently recovered a healthy tone of mind as to appreciate the peril and the disgrace of her position, and to take the proper legal measures to extricate herself from it.

Objection was made to the filing of this supplemental answer, but it was permitted, the court being of the opinion that the more regular course would be for objection to be made to the testimony to be offered under it, and accordingly objection was thus made, the testimony admitted, and a bill reserved. The reasons of the court do not appear in the bill, but we think the ruling is correct. In actions for the interdiction of a party for insanity, investigation of the motives of those who are provoking the interdiction are of the utmost consequence. The court will guard with peculiar care the alleged lunatic from interference, springing from a hostile motive, and will weigh with more precision the evidence of lunacy, if the person by whom it is tendered appears to be actuated by a sinister intent.

A commission of physicians was appointed to examine Mrs. Francke, three of whom made a joint report in June, 1876, and the fourth later. Another commission of four other physicians reported in July. These reports, and the testimony of many witnesses, are before us. Before summing up the evidence, it is necessary to speak of the insanity or imbecility or infirmities which the Code (Civil Code, articles 382 and 409, new numbers 389 and 422,) pronounces to be cause for interdiction.

Psychologists have vainly attempted to define insanity. The vulgar notion is, that it consists in an entire deprivation of reason and consciousness, but observation has shown that the insane often possess both of those mental qualities. Locke defined a madman to be one who reasoned correctly from false premises, but that would embrace a very large class who are commonly supposed to be sane. Lord Eldon has the credit of originating the phrase, " of unsound mind," and it is a legal,

not a medical, phrase. It is said that no definition can include all the varieties of the disorder, but the power which is most manifestly deficient in the insane is generally the controlling power of the will. Taylor's Medical Jurisprudence, 2 vol. 476, et seq.

It is conceded in this case that the proposed interdict is not insane, and that is the concurrent testimony of the examining physicians.

Imbecility is idiocy in a minor degree. An authority on this subject (Ray, quoted by Wharton & Stille, Medical Jurisp., 1 vol., section 314,) arranges the diseases included in the general term mental derangement under two divisions, founded on two very different conditions of the brain ; the first being a want of its ordinary development, the second a lesion of its structure subsequent to its development, in the former of which divisions he places idiocy and imbecility, differing only in degree. The same author informs us that " in imbecility the development of the moral and intellectual powers is arrested at an early period of existence. It differs from idiocy in the circumstance that while in the latter there is an almost utter destitution of every thing like reason, the subjects of the former possess some intellectual capacity ;" and, further on : " No cases subjected to legal inquiry are more calculated to puzzle the understandings of courts and juries, to mock the wisdom of the learned and baffle the acuteness of the shrewd, than those connected with questions of imbecility.     *     *     *     The real capacity of the imbecile's mind is to be estimated, not from any single trial, but by a careful appreciation of all its powers." Ray's Medical Jurisp., sec. 63, 121–122.

Esquirol, classifying those unsound of mind, says :

"Néanmoins, en étudiant les faits, on peut classer les idiots en deux séries dans lesquelles ils se groupent tous. Dans la première sont les imbéciles ; dans la seconde les idiots proprement dits. Dans la première, l'organization est plus ou moins parfaite, les facultés sensitives et intellectuelles sont peu développées ; les imbéciles ont des sensations, des idées, de la memoire, des affections, des passions, et même des penchants, mais à un faible degré. Ils sentent, ils pensent, ils parlent, et sont susceptible de quelque éducation." Maladies Mentales, 2 vol. p. 288.

And last, the author just quoted says : " The term idiot is applied to those who from original defect have never had mental power. Idiocy is marked by congenital deficiency of the mental faculties. There is not here a loss or perversion of what has once been acquired, but a state in which, from defective structure of the brain, the individual has never been able to acquire any degree of intellectual power.     *     *     * There is a state scarcely separable from idiocy in which the mind is capable of receiving some ideas, and of profiting to a certain extent by instruction. Owing, however, either to original defect, or to one proceeding from arrested development of the brain, the minds of such persons

are not capable of being brought to a healthy standard of intellect. This state is called imbecility." Taylor's Med. Jurisp. 2 vol. 502. That is the state of Mrs. Francke, according to the counsel for her husband, and the physician who made a separate report confirms it: "Madame Francke est dans l'imbécillité, dans cette imbécillité que la médecine légale regarde comme faisant partie intégrante de l'aliénation mentale. Il est, donc, impossible d'admettre qu'elle est saine d'esprit; elle est, au contraire, aliénée pour le médecin legiste." The joint report of the three physicians appointed with Dr. Faget is less pronounced than his, and avoids (as one of them insists) the declaration that she has reached the state of imbecility. Their conclusions are these:

"1o. Que Madame Francke est atteinte d'un affaiblissement des qualités intellectuelles qui va jusqu'à l'imbécillité.

"2o. Qu'elle est incapable de se guider dans la vie et de diriger ses intérêts.

"3o. Qu'il serait dangereux de lui confier l'administration de sa fortune, et de lui laisser l'exercice de ses droits civils.

"4o. Qu'il y a lieux, par conséquent, de prononcer son interdiction."

We do not propose to accept the conclusions of others as to the decree which a tribunal should pronounce upon a given state of facts, but to take the facts themselves, examine their relation to each other, and their bearing upon the grave matter we have to determine. Nor can we be guided or influenced solely by the opinions of medical men who have made the examination of the proposed interdict at a single interview or under the unfavorable circumstances of a consciousness on the part of the sufferer that she is undergoing a test of her sanity. We take the several reports of the physicians as worthy of the most careful examination and the most respectful attention, to be weighed along with other testimony, and all to be considered together in assisting us to our own conclusion. So careful is our law to surround proceedings of this nature with all safeguards, that it permits this court to hear new proofs, and to question the person whose interdiction is sought, in order to ascertain the state of her mind. Civil Code, art. 389, new number 396.

The four other physicians, in giving the résumé of their deliberations, conclude —

"1o. Madame Francke n'est pas atteinte d'aliénation mentale.

"2o. Jusqu'en 1869, elle n'a présenté aucun signe d'idiotie ni d'imbécillité.

"3o. L'imbécillité qui est une infirmité congénitale, n'ayant pu se déclarer brusquement à l'âge de trente-quatre ans, il reste prouvé que Madame Francke n'est point imbécile.

"4o. Relates to the source of disorders of the patient.

"5o. Ses facultés intellectuelles sont affablies, la mémoire incertaine.

Madame Francke ne peut pas veiller à ses intérêts personnels (ni prendre soin de sa personne,") ajoute le Dr. Boyer.

The eight physicians are thus unanimous in pronouncing Mrs. Francke not insane, and four of them declare that she is not imbecile. They all concur in saying that she can not take care of her personal interests, or manage property—she is a *pauvre d'esprit.* It is worthy of remark that a leading idea in the minds of the medical experts who thus examined Mrs. Francke was that a part of their function was to ascertain if she was capable of transacting business, of making or understanding accounts, or of supervising or directing the management of property. Unquestionably, the proof is conclusive that she can do none of these things. Her weak intellect, shaken from its poise during the rude ministrations of Mrs. Lause in 1863, toppled over, and her disordered faculties ran riot with the wildest vagaries. This *folie* reached such a point in 1869 that a certificate *d'aliénation mentale chronique* was given by Dr. Deléry, and her confinement in the asylum was effected, and Sister Angéle, a ministrant there, testifies there was no improvement in her condition during the year of her detention.

Of her condition since, the most important witnesses are her mother, with whom she is living, and Dr. Landry, her medical attendant for seven years. And it is impossible, and we may add improper, not to attach greater importance to the information given by those who daily surround a person, and whose watchful supervision is constant, than that given by those who approach one at rare intervals and under exceptional circumstances, whose mission, by its very object, predisposes the nervous and *craintive* patient to increased tension of the feeble mental power left to her.

The change in Mrs. Francke's condition a month after her release from the asylum was, in the opinion of her husband, miraculous. The family physician says that her daily necessities do not require constant supervision, and that he has not seen any thing in her that produced that impression since her release. He is convinced that she could go out and make small purchases at the stores, and recollects her giving an account to her mother of what she had been buying; thinks she could go out upon the streets; the suit for interdiction has produced upon her an extreme fear of having to return to her husband's house, and of having to leave her mother, to whom she clings with childlike tenderness and earnestness. The mother finds her submissive and quiet, receives from her assistance in the minor household cares, and permits her to occupy a separate room, the arrangements of which she personally makes. Jules Lambert, the step-father of Mrs. Francke, and Mrs. Block have lived in the same house with her several years immediately preceding the hearing of the cause below. They speak of her conduct and appearance as

not in any manner calculated to attract special notice, and say that her daily behavior is characterized by propriety and decorum. The weakness of her mind is conceded by all.

In noting the declarations of the various persons touching the mental condition of Mrs. Francke, we shall not omit that of our learned brother who tried the cause, whose observations upon the questions involved, whether of fact or of law, have attracted our respectful attention. He found her intellectual faculties very weak, and her memory uncertain. She confessed her inability to manage her own affairs, but the judge would not attempt upon such a cursory examination to define her mental condition, and relied more upon the physicians than upon himself. His judgment upon the law and the evidence was for her interdiction.

We have now to consider the matter set up in the supplemental answer, as tending to show the motives of the husband in praying the interdiction of his wife. Her suit for divorce was filed on the twenty-second of January, ten days prior to his suit for her interdiction. The charge made therein of adulterous intercourse between the husband and Ellen Doyle, carried on under the marital roof, is supported by proof. The first fruit of this concubinage was born in the room adjoining the wife's, and the birth of that child has been succeeded by others of the same parentage. Madame Lambert says there is no concealment of the paternity of the children, and one of the counsel for the husband in his oral argument implicdly admits, without palliating, the fault of his client.

The wife expressly alleges, that the object of the husband in confining her in an asylum, was to rid himself and his paramour of her presence. We do not admit this theory. On the contrary, the *folie* had then attained such proportions as to render some restraint necessary. It is also charged that the present suit for interdiction is designed for the sole purpose of preventing the consummation of the divorce. The sequence of the events makes that probable, and it is admitted by defendant to be the fact. And it may be observed that the court has no option in selecting a curator for an interdicted wife. C. C., art. 399, now 412.

Much, and not unnecessary pains, have been taken to acquaint the court with the early life of Mrs. Francke. Her studies during school life, her participation in exercises which preclude the supposition of congenital infirmity, her appearance in society, and her marriage, without suspicion by her family or her husband, of any mental lesion, have been reviewed with care to show that her affliction can not be classified as the imbecility defined by the alienists from whose works we have quoted. It can not therefore be assigned a higher grade in the category of mental diseases than weakness of mind—faiblesse d'esprit.

In determining whether this is sufficiently developed to warrant us in pronouncing her interdiction, we must consider the purposes the law has

in view in such proceedings. The objects to be accomplished are the preservation of the proposed interdict's rights of property, the safety of her person, or the protection of society.

Mrs. Francke has no property. She brought nothing into marriage, and has received nothing since. We can scarcely be asked to interdict her on the supposition that at some future time she will receive property. The well or ill-being of her person has been tested under the different modes of treatment, and we have already noted the result in each, and society does not need from our hands to be assured of protection from this unfortunate and harmless woman. Her story and her condition have provoked our interest, and demanded the most careful scrutiny of this record. It is one of those domestic tragedies whose mournful pathos touches the heart, inflames its sympathies, and well-nigh misleads the judgment. Our opinion is that Mrs. Pauline Francke is not liable, in her present condition, to interdiction under our law.

It is therefore ordered, adjudged, and decreed that the judgment of the lower court is avoided and reversed, and that the petition of the husband, Justus Francke, be dismissed at his costs in both courts.

---

## CONCURRING OPINION.

DeBlanc, J. It can not be disputed that Mrs. Francke has been insane,. and that at the date of the trial of this case her mind was still, but slightly, obscured by the receding cloud which settled upon it at the birth of her first child.

Do these facts require, would they justify her interdiction?

For the purposes of this examination I am disposed to admit more than was proven. If, as alleged, she is now an imbecile, when was she stricken with imbecility? Was it from the cradle and by the hand of God? Was it by accident, and before or after her marriage? Whether before or after, can he who led her to the altar, who gave her his name, whose blood is mixed to her blood in the veins of their children, whose sacred obligation is to support, assist, and protect her, be heard in this, his attempt to publish to the world that inherent or accidental misfortune?

He can, but only as a matter of inevitable and inflexible necessity. He can, but in whose interest? Her own and that of society. He can, as a protection to her rights and the rights of others, never as a speculation, or merely because she is incapable of administering her estate.

If, though not highly gifted, she was possessed of an ordinary share of intelligence and reason, and, as presumed by distinguished physicians, lost that share in the nuptial couch in imparting life, should not the husband and father be the first to excuse the cause of her insanity?

Francke vs. His Wife.

Her intelligence has not perished, it is partly veiled; her reason is lingering, not dead. In spite of sinister predictions, the paralyzed faculties are gradually escaping from the shackles, the grasp of insanity. Science condemns, and after its verdict, wraps itself in its impervious incredulity and looks with a dreadful pity on those who dare hope after it has condemned. Affection hopes and struggles, and its priceless cares have often reversed the solemn verdict of a fallible science.

Defendant is improving, and since when? Since she has been with her mother. The change in her condition amounts to a miracle; this the husband has acknowledged, and, nevertheless, he enters a court of justice to ask her interdiction, and, perhaps, to wrest the deserted wife, the deserted mother, from her parents' home, from those who have accomplished that miracle. The hour is ill-chosen; a decree against the defendant would be equal to a sentence, and none of the causes shown would justify that sentence.

Article 389 of the Civil Code does not command the interdiction of those whose mind is affected. It leaves the court to determine whether there is an actual necessity to interdict, and, in my opinion, that necessity never arises in a home where the unfortunate mother has two daughters to take care of her person, the unfortunate wife a husband to administer her estate, unless she be absolutely uncontrollable, or forsaken by husband and children.

This case has but one object—this is frankly admitted. What is that object? To defeat an action of divorce brought by the wife against the husband. Is that a legitimate cause to interdict the wife? In that action she charges against her husband an open adultery, one commenced under the roof of the common dwelling, and he confesses the adultery. He says that in asking for a divorce his wife was instigated by parties who are moved by selfish and sordid intentions. Is he actuated by pure and lofty motives? What does he dread? Is it the dissolution of the tie which, by a fiction of the law, binds him to defendant? Another has taken her place at the fireside, and there remains to be separated but the property which for years has been administered and enjoyed by the husband alone. His wife is neither dangerous to herself nor dangerous to others, and we can not, to defeat an acknowledged right, to prevent a divorce to which she may be entitled, decree her interdiction.

It is useless to follow in the pathways of science those who have learned how we think, how we love, how we hate, how we live, and how we die. The task would be too difficult, and we have but to inquire: Is Mrs. Francke insane? She is not. Was she born and is she an imbecile? We believe not. Can she take care of her person? She can and does with her mother's assistance. Is she capable of administering her estate? She has none to administer. Four of the physicians who examined her

testified "that since she left the asylum in 1869 there has been in her condition a remarkable improvement." Is not that declaration sufficient to at least suspend the interdiction?

In their supplemental brief plaintiff's counsel contend that though signed by four skillful physicians, one of the reports is evidently the work of a gentleman who, in this controversy, leans to the side of defendant's mother. The report, after consultation, may have been written by the family physician. Does this not increase instead of reducing its value, and can it be fully presumed that in a case of this magnitude, one in which there already was a difference of opinion between the learned experts, three physicians of high standing would have condescended to approve a false report?

We have weighed, with the sincere deference due to real talent, the professional opinions expressed as to the actual condition of defendant's mind. They have not raised the veil of mystery and doubt which cover that condition, and we feel authorized to look beyond these conflicting opinions for those plain, positive, self-evident facts which overcome and crush incertitude, and which are understood and explained without the flickering light of a deceitful science. We have heard friends and strangers, nurses and relations, physicians and alienists; let us hear the pretended imbecile. One of the experts interrogates her:

D. Combien d'enfants avez-vous?

R. Cinq.

D. Des garçons ou des filles?

R. Quatre filles et un garçon.

D. Vous n'avez pas eu d'autres enfants?

R. Oui, un enfant mort-né, et une fille morte brûlée à l'âge de trois ans.

D. Quel est l'aînée de vos enfants?

R. C'est une fille qui a maintenant dix-neuf ans.

D. Aimez-vous vos enfants?

R. Mais oui, je les aime.

D. Les voyez-vous souvent?

R. Non, ils ne viennent plus depuis ces affaires-là.

D. Vous souvenez-vous qu'à une autre de nos visites, vous nous avez dit que vous n'étiez pas fachée que vos enfants ne viennent plus vous voir? Pourquoi nous avez-vous dit cela?

R. Parcequ'ils venaient pour cinq minutes, en grande cérémonie, et qu'ils semblaient ne pas tenir à moi.

D. Quoi! vous n'avez pas d'autres raisons?

R. Et puis, ils me parlaient continuellement de cette femme.

D. Quelle femme?

R. De cette femme qui est la cause de toutes mes tracasseries; de leur Ellen.

D. Mais si cette femme n'était pas là, et que votre mari voulût vous reprendre chez lui, seriez-vous contente d'aller vivre avec vos enfants et votre mari?

R. Oh! non.

D. Et pourquoi cela?

R. Parceque mon mari me remettrait à l'asile, comme il l'a fait une première fois.

D. Mais si votre mari, allant vivre dans son pays, vous laissez vos enfants avec de la fortune, seriez-vous contente alors d'avoir vos enfants auprès de vous?

R. Ce sont bien là des châteaux en Espagne! Mais je serais bien heureuse si cela pouvait se réaliser.

Are these answers the wild freaks, the inordinate fancies of an insane mind, the meaningless and extravagant expression of an insane tongue? We believe not.

Mrs. Francke, we admit, might have been interdicted in 1868 or 1869. She was then insane and predisposed to occasional outbreaks of passion and immodesty; but that time and that occasion have passed; she is now improving. That is denied by a few, asserted by others:

"En admettant l'incapacité de Madame Francke dans l'état où elle est actuellement de veiller à ses intérêts, nous la considérons comme étant un cas exceptionnel, qui mérite l'attention et les égards de tout homme qui porte en lui la dignité de sa profession. Sa mère l'ayant retirée de l'asile a, pendant sept années de dévouement et d'abnégation maternelle, amélioré tellement son état, que l'un de nous, le Dr. Boyer, a été frappé du changement qui s'est fait en elle. Nous avons tous connu la douceur, la tendresse maternelle, et les consolations qu'elles apportent aux heures douloureuses de la vie. Mais peut-on mesurer l'étendue et les effets de la douleur chez une mère qui souffre dans l'isolement, loin de toute affection, loin de ses enfants; loin surtout de celle qui a aujourd'hui dix-neuf ans, et dont la naissance peut avoir été l'origine de l'affaiblissement des facultés qui jusqu'alors avaient joui de toute leur force et de toute leur facultés?

"Nouvelle-Orléans, le — Juillet, 1876.

"Signé:

"J. B. GAUDET,
"H. DE RANCÉ,
"P. C. BOYER,
"A. L. LANDRY."

There is at least a doubt as to the wreck or resurrection of her intelligence and reason, a hope that her depressed and troubled faculties may resume their sway, and we unhesitatingly place to her credit that doubt and that hope.

Family is the basis of society. When and wherever the family fails in

the discharge of its duties, society is deeply affected. The first of these duties, as between the parents themselves and the children and parents, is to stand by and not to abandon one another in the days of affliction and adversity, and to dispel or calm, with an affectionate hand, the anxieties and sufferings to which we are subject. The quiet and harmless victim, crushed by insanity, or lingering from its effects, is not a criminal, and should not, as a criminal, be incarcerated and deprived of liberty. Her asylum is her home, and the homeless alone, or the mad, should be sent to the asylum. Interdiction is a harsh, it should be the last, resort.

I concur in the opinion delivered by the Chief Justice.

---

### ON MOTION FOR REHEARING.

The opinion of the court was delivered by

DeBLANC, J. Plaintiff's counsel have filed in this case an application for a rehearing. Their last brief adds little to the able and complete argument first submitted by them.

They contend that we have erred in the discussion of the facts and the construction of the law: as to the facts, in attributing to plaintiff motives by which he was not actuated, and in lending our countenance to a charge which, if untrue, would do great injustice to Mr. Francke, his family, and even to the lady whose condition is the subject of this investigation ; as to the law, in supposing that the court has no option in selecting a curator.

The facts disclosed on the trial do not show with legal certainty that at the date of said trial, or even during the six or seven years which preceded that date, Mrs. Francke had been insane, nor has it been shown or alleged that her interdiction is necessary in her own interest and to preserve the rights and the welfare of her family.

To interdict is a grave, a responsible task, the most important that a court can be called upon to perform. Insanity, we know, is a misfortune, not a dishonor, but it is a misfortune which, in its resuls, is equal to a dishonor ; it affects the destinies, blights the hopes, of a whole family. The sentence of interdiction, for it is a sentence, when pronounced against a parent, impresses on that parent's name, by whomsoever borne, a badge of suspicion which time itself does not, can not, obliterate. Woe to the son or the daughter of whom it can be said, they are the children of an interdicted !

The husband's right to interdict his wife arises when? Not when the last chance of her recovery has fled, but when her insanity is a danger to herself, her home, or her children ; when, unless confined and watched, she would be apt to injure herself, kill her children, or set fire to her

home ; or when, to save her property, to protect her imperiled rights, her signature to an act, her consent to a proceeding, become indispensable, and she is unable to comprehensively give that signature and consent.

There are obligations which are imposed. by the laws of God. When disregarded, they should be taught and enforced by the laws of the State.

The French legislation on this subject differs from ours. The first is imperative : " Le majeur qui est dans un état habituel d'imbécillité, de démence, ou de fureur, *doit* être interdit." Ours provides, " that lunatics, idiots, and those who are incapable of taking care of their persons, or administering their estates, *are liable* to be interdicted." Then, to authorize the interdiction, two conditions are required : the party sought to be interdicted must be incapable of taking care of his person, and incapable of administering his estate. Those two conditions must exist simultaneously, and their actual existence and the necessity of the interdiction must be shown beyond the shadow of a doubt.

We attach no importance to the well-established fact that in or previous to 1869 Mrs. Francke had been insane. Our investigation can not extend so far in the past. We are not to inquire whether she has been, but whether she is now, insane. It may be that she is, that those who allege so are right, that those who deny are wrong. That fact, however, is not only not proved, but contradicted by experts as intelligent, as distinguished, as those who assert it ; contradicted by those who have often conversed with her on occasions less impressive than the solemn visit and solemn interrogation by a council of physicians ; contradicted by every one of her answers to those experts.

What was and what is Mrs. Francke's condition ? She was not born an imbecile ; her insanity was due to the birth of a child. While she was in her husband's house the insanity increased. It was not alleviated in the asylum, and is slowly but positively yielding to her mother's care. In one month, under that care, the change in her condition was wonderful. This was acknowledged by her husband, and struck Dr. Boyer.

In his report of the eleventh of February, 1876, Dr. Faget said: "L'état mental de Madame Francke est celui que les auteurs aliénistes designent techniquement sous le nom *d'imbécillité*, c'est-à-dire faiblesse d'esprit. Chez Madame Francke, cette faiblesse d'esprit est portée au point que *certainement* elle est incapable de gérer ses affaires, et que *très probablement* elle ne peut pas même se passer des petits soins et de la sollicitude que réclament les premières années de la vie."

In his last report he is more positive: "Madame Francke est dans l'imbécillité—pour le médecin légiste, elle est aliénée—incapable de prendre soin de sa personne et de ses affaires. L'attaque d'éclampsie puer-

pérale, et, plus tard la manière compromie dans laquelle elle est tombée et retombée pendant plusieurs années, n'expliquent que trop bien son état d'imbécillité. De 1869 à 1876 je n'ai pas revu cette dame comme médecin."

Thus, for seven years, he lost sight of Mrs. Francke, and, after that long period, he met her as an expert appointed by the court to examine her. On that occasion what must have been, what were his impressions? The veil of the past was lifted by the recollections of 1869, and those recollections fell from his memory in his report. He went to, and left her, with the unremoved conviction that she was insane.

The conversation between defendant and the experts excludes the idea of either insanity or imbecility. The answers to their questions were the most rational, the most appropriate, that could have been given. They are on record, and no one could successfully combat that they clearly describe her condition, her feelings, her sorrows, her shattered destiny, those cherished hopes which now, she said, are but air castles. Not one of those answers is marked by an extravagant thought or extravagant expression, and their value in law can not be reduced by the brilliant but naked opinions of the most eminent adepts of an enlightened or difficult science.

Plaintiff's counsel contend that, if the divorce be granted, and if the view we have taken of this case be correct, not less than $20,000 shall fall under defendant's administration. What of it? If she is not insane, if she is entitled to a divorce, the dreaded consequence shall flow, not from our decree, but from the law and from the husband's fault.

It was not, however, on that charge of adultery, or on that tacit admission of its truth, that we have based our decision ; but on the fact that on the trial of this case it was not proven that Mrs. Francke was insane or that she is an imbecile ; and it was proven that her condition had remarkably improved, and that she can, at present, take care of her person ; that she is not a burden to her husband, or a danger to her children ; that she has in no way exposed their rights or troubled their welfare, and that her interdiction can not be claimed or allowed either as a matter of right or of necessity, either in her own or the interests of others.

We are told that we have the right to proceed to the hearing of new proofs or to question Mrs. Francke ourselves. This is true, but why should we do it? She has been examined by the district judge, by experienced and distinguished physicians. We have their reports, their opinions, their views, their impressions, and we are not inclined to again drag in court or to again subject to an additional investigation a nervous, timid, and suffering victim, whose depressed and delicate mind might be confused and affected by what she might construe as a determination to convict her of insanity.

Plaintiff says it was an error to suppose, as he alleges that we have done, that the court has no option in the selection of a curator to the interdicted wife. This, on our part, is no supposition. The Code provides in terms subject to but one construction that "the married woman who has been interdicted is, of course, under the curatorship of her husband." That he may, for cause, be removed or excluded from the curatorship we entertain no doubt, but until the removal or exclusion, what might not happen!

This court has often held in contests for money, land, or cattle, that he who only makes out a probable case can not recover. Should we depart from that rule when asked to destroy a capacity and the rights attached to that capacity; when asked to enslave the will and the functions of that will; when asked to place in charge of a curator the property, the will, the body, the privileges, and liberty of any one? Assuredly not.

Under our law, to justify such a sentence, three causes are indispensable:

First—The indisputable incapacity to administer one's estate.

Second—The absolute inability to take care of one's person.

Third—An actual and unavoidable necessity to interdict.

In this case only one of these conditions, the first, was shown to exist. The rehearing is refused.