(77 South. 515)

No. 22742.

Succession of PONS.

(Jan. 3, 1918.)

*(Syllabus by the Court.)*

1. ATTORNEY AND CLIENT ☞141—SUCCESSION—INTERDICTION SUIT—ATTORNEY'S FEES—AMOUNT.

A fee of, say, $33,500 may be well earned in the defense of a suit for interdiction, brought by the children and heirs against their mother, contested during a period of nearly three years, involving the civil life and the liberty of the defendant and her control of an estate appraised at nearly $350,000, and terminating in its abatement by reason of the death of the defendant.

2. EXECUTORS AND ADMINISTRATORS ☞216(1)—SUCCESSION—MANAGING ESTATE—SALARY—RECOVERY OF BALANCE.

Where one contracts to pay another a salary for a fixed term of years for managing an estate, but, before the expiration of such term, is made defendant in a suit for interdiction, in which, by an ex parte order of court, an administrator pro tem. is appointed to manage the estate; and the manager, under the contract, acquiesces in such appointment, and without asserting any rights, assists the administrator, who is subsequently paid for the management, under a judgment obtained contradictorily with the former manager, who, by that time, has become the executor of the deceased owner of the estate, but who still asserts no claim under his contract, such manager cannot thereafter recover his salary for the balance of the term fixed by such contract.

3. PHYSICIANS AND SURGEONS ☞23—SERVICES OF SPECIALIST—RECOVERY.

Where the services of a specialist are engaged under a contract that they shall be paid a certain sum in the event of certain specified possible happenings and a larger amount in the event of other happenings, they can only recover according to their contract, and, if the specified possible happenings do not happen, cannot recover the larger amount.

4. PHYSICIANS AND SURGEONS ☞24(3)—ACTION FOR MEDICAL SERVICES—RECOVERY.

One who seeks to recover for medical services upon the basis of consultations at so much per consultation or per visit should be able to show how many consultations or visits were had or made.

5. EXECUTORS AND ADMINISTRATORS ☞206(1)—SUCCESSION — CLAIM AGAINST ESTATE—CARE OF DECEDENT—RECOVERY.

Where a married daughter and her family, or husband, live at the house and at the expense of her mother, who, being made defendant in a suit brought by her other children for her interdiction, is provided, at her own expense, with such medical attention, nurses, and servants as she needs, and no question of paying her daughter for her care and attention is suggested, a claim therefor against the succession of the mother is properly rejected, the more especially where it appears that the daughter is one of two heirs who receive under the will of the mother one-third of a considerable estate over and above the legitime to which the law entitles them.

6. EXECUTORS AND ADMINISTRATORS ☞294—SUCCESSION—OBLIGATION OF HEIRS TO COLLATE MONEY—DETERMINATION OF QUESTION.

The question of the obligation of one or more of the heirs of an estate to collate money paid to them, by consent of their coheirs, prior

to the appointment of the executor, is one which the executor may leave to the heirs for settlement.

Appeal from Civil District Court, Parish of Orleans; T. C. W. Ellis, Judge.

In the succession of Widow A. Pons. From a judgment rendered upon oppositions to the final account of P. L. Fourchy, testamentary executor, opponents, Mrs. Alice Veazey, and others appeal. Judgment amended by reducing the amount allowed to the executor or agent and the amount allowed Dr. Joseph A. O'Hara individually, and Drs. O. L. Pothier, S. F. Mioton, and Joseph A. O'Hara, and, as amended, affirmed.

See, also, 141 La. 331, 75 South. 70.

Dart, Kernan & Dart, of New Orleans, for appellants-opponents Veazey and others. P. L. Fourchy and Woodville & Woodville, all of New Orleans, pro se. William J. O'Hara, for appellants O'Hara and others.

MONROE, C. J. This matter is brought before the court by appeals from a judgment upon oppositions to the final account of the executor. The appellants are Mrs. Veazey and others, heirs at law, and testamentary, P. L. Fourchy and Woodville & Woodville, P. L. Fourchy individually and as testamentary executor, Drs. O'Hara, Mioton, and Pothier, Dr. O'Hara individually, and Mrs. Suarez. "Mrs. Veazey and others" (including all the heirs except Mrs. Suarez) are now insisting upon their oppositions only as to the following items, which were allowed by the executor but reduced or disallowed by the trial court, to wit:

(1) The item of $30,810, less $10,000 paid by consent, claimed by P. L. Fourchy and Woodville & Woodville as balance of attorney's fees.

(2) The item of $18,500 claimed by P. L. Fourchy as balance due under contract with decedent.

(3) The item of $3,000 claimed by Drs. O'Hara, Mioton, and Pothier for services as experts.

(4) The item of $1,000 claimed by Dr. O'Hara for medical services.

The remaining appellants are asking that the judgment appealed from be amended, and that they have judgment for the amounts claimed by them and recognized by the executor. After a brief preliminary statement, we shall proceed to the consideration seriatim of the oppositions and claims thus mentioned.

On November 27, 1912, the heirs of the decedent, with the exception of her daughter, Mrs. Suarez (being four married daughters and a grandson), brought a suit for the interdiction of their mother and grandmother, who was then past 70 years of age, and caused an administrator pro tempore to be placed in charge of her estate, though it was being honestly and efficiently administered by P. L. Fourchy, whom the owner herself had selected, and who was discharging his functions under a contract which had still three years or more to run, and whereby he was to receive an annual salary of $5,000 during that period. Mr. Fourchy and Messrs. Woodville & Woodville were then employed to defend the suit so brought, and discharged their obligations in that respect until about the middle of September, 1915, when their client died, at which time the suit was pending in the district court, awaiting retrial, under a judgment of this court remanding it for the admission of certain testimony.

1. The Messrs. Fourchy and Woodville & Woodville fixed upon $34,310 as a proper fee to be charged for their services in the interdiction proceedings and others incidental thereto, that amount representing 10 per cent. of the appraised value of the estate of their client as shown by the inventory taken, at the inception of those proceedings. The sum of $3,500 was paid on account of the fee to be charged by the administrator pro tempore, though it does not appear that he was told

what the total charge would be, and $10,000 was paid on the same account, by consent of parties and without prejudice to the position of either side, after the filing of the account that we are now considering, so that the amount really in dispute at present is $20,-810. After considering the evidence, showing that the estate of Mrs. Pons was appraised at $343,100.79, in the interdiction proceeding (in 1912), that at her death in September, 1915, it was appraised at $310,446.53, and that the amount now in the hands of the executor for distribution is $134,128.24, and after considering the evidence showing the time actually spent in court during the interval between the dates thus mentioned by Mrs. Pons' attorneys in their efforts in her behalf, and other services rendered by them, the learned counsel for the heirs make a résumé of the situation and state their view of the question to be decided as follows:

"Therefore they spent in court during 3 years, in all, 89 days. We imagine that any reputable lawyer would be glad to take employment in this or any other case at $50 per diem for trial work, and would consider himself well paid. We say this with all the greater confidence because in the parish of Orleans the lawyer's trial work, as a rule, leaves his mornings and evenings and Saturdays free. * * * Besides this, * * * the actual court work was not consecutive, but spread out through the months, a day now, and 2 or 3 days then, the highest number of days being 10 and 12, respectively. * * * Granting, now, that we should add time for the study of the case, the interviewing of the witnesses, the consultation with experts, and that it should be compensated at the same rate, the record is silent as to the time expended in such work, but any active lawyer would say at once that a case of this kind would not be worked on consecutively; the other work of a lawyer's life would be attended to; in other words, it does not consume the whole of the day or night. But we can go further and listen to the widest suggestion about the length of time thus consumed, and yet we could not bring ourselves to admit, in the absence of actual diary entries or contemporary notes, or specific proof, that a greater time was consumed than that actually spent before the courts. There is no such proof in this record; that is, the testimony establishes no fixed times or periods of work on study, preparation, etc. There are no contemporary diary entries, no contemporary notes, not even specific, positive testimony show-ing the necessary data upon which to base an estimate. The oral testimony is all vague and general. Under such circumstances, with the burden of proof on the claimants to make their case certain, we think we are entirely liberal in crediting them with a period of study and preparation equal to the time used up in court. This would be 89 days for preparation and 89 days in court, or 178 days, at $50 per diem, would make $8,900. To this figure and to this allowance of time we should add the work in preparing briefs in the appellate court and the arguments there. * * * Those briefs are before your honors, and you are the best judges of the nature of the work and of the time spent in the confection thereof and in the oral arguments. All of this work was in this court except one minor case, a habeas corpus before the Court of Appeals, which was denied on preliminary application. Considering all the foregoing, we suggest that a fee of $4,500 would be a liberal allowance for the work in the appellate courts. Those two sums, $8,900, plus $4,500, equals $13,400. The claimants have already received $13,500. The judgment below, which allowed $20,000 additional, is manifestly excessive."

What may appear to be "silence" and "vagueness" to a person who is interested in hearing and taking into account particular sounds and expressions may be the most pronounced vociferousness and definiteness to another who is concerned about something else. Mr. Fourchy, as a witness in behalf of himself and associates, makes a statement of this case as he sees it, and is corroborated by the testimony of one of the Messrs. Woodville, and also by the impression produced upon the minds of the trial judge and of the members of this court by the proceedings in their courts, respectively; and the statement so made, under oath, is entirely uncontradicted in so far as any of the facts included therein are concerned. He says that his adversaries on one occasion obtained an order of court (upon an ex parte application as we understand) revoking an allowance for the maintenance of Mrs. Pons; that he was therefore obliged to maintain her at his own expense for several weeks before he could get the order rescinded; and that he and his associates found it necessary that one or the other should visit the court

every day during the pendency of the litigation, both before the court opened and after it adjourned, in order to be able at once to make answer to applications of a similar character. He was asked:

"Mr. Fourchy, during all the time that this litigation was going on, up to the time that Messrs. Dart, Kernan & Dart appeared in the case, was there ever a day that either you or some member of the firm of Woodville & Woodville did not go to court and examine the record, to see if anything had been filed?"

And he replied that there "was not a day"; that he arranged to be notified whenever the senior counsel then representing the heirs appeared in the building, and made it his business to be there; that the counsel on one occasion, at 4 o'clock in the afternoon, made an application to the Court of Appeal on behalf of the grandson, who at another time kidnapped his grandmother, for a writ of habeas corpus to have her produced; that he immediately got in touch with the judges, made his explanation, and the writ was refused, and that similar applications were made in the district court and in this court, all of which were answered before they could be acted on, and all of which were refused; that every effort was made by adverse counsel to have the old lady brought into court; that arrangements were made to have her photographed; that he thinks that such an experience during the last few months of her life would have "killed her then and there"; that by way of preparation for the second trial (after the case was remanded) he had found and interrogated (at the offices of the expert alienists) 60 or 70 witnesses, who had known Mrs. Pons prior and up to the filing of the suit for interdiction.

By far the greater portion of the matter upon the basis of which the question here presented is to be decided was within the immediate judicial cognizance of the trial judge, and no inconsiderable part of it has also fallen within the cognizance of this court. Pons v. Pons, 137 La. 25, 68 South. 201; Ruiz v. Pons, 141 La. 110, 74 South. 713; Succession of Pons, 141 La. 331, 75 South. 70. We are therefore able, in concurring in the conclusions reached by our learned brother of the district court, to corroborate to a large extent the findings upon which they are based; and, that being the case (with some reservation merely as to the effect of the decisions of this court in the Francke and Watson Cases, to which he refers), we include in, and make part of, this opinion, the ably prepared reasons for judgment handed down by him upon the issue under consideration, to wit:

"Reasons for Judgment of Hon. T. C. W. Ellis, Judge of the Civil District Court, Parish of Orleans.

"The opponents to the executor's account are the heirs of age of Mrs. Pons, and were the plaintiffs in the suit to interdict her.

"Their first opposition to be considered questions the amount of the fees of Mr. P. L. Fourchy and Messrs. Woodville & Woodville, for their services rendered to her in that suit, and to her estate, in matters growing out of said suit.

"The charge is $30,810. Mrs. Pons' estate was valued at about $343,100.79. The litigation began in November, 1912, and, on the issue of interdiction, ended in September, 1915, but continued, as to numerous incidental issues, such as liability for costs, opposition to the final account of the administrator pro tempore, etc., which were settled finally in the Supreme Court in the early summer of 1917.

"These services cover a period of four years and several months of active, and at times strenuous and extraordinary, litigation.

"In their testimony Mr. Fourchy and Mr. Woodville on the trial of the oppositions recount in detail their services to Mrs. Pons and they estimate their value at the sum claimed and stated in the account.

"In support of their evidence they offered the folios of the volumes that make up the record of that litigation, and put in evidence the testimony of several members of this bar who, as experts, declared the amount of fees charged fair and just.

"The opponents offered no proof in rebuttal.

"If the case submitted was only an ordinary one, the rule that a claimant is only required to establish his demand by the preponderance of evidence would readily compel judgment against the opponents.

"But, instead, it is of that class of cases where all the services rendered passed under the eye and immediate presence of the judge, and where

he is clothed by the jurisprudence with some measure of power to determine for himself and on his own conscience the quantum that should be fixed.

"I recognize the responsibility involved in this appeal to the sense of right, this appeal to the conscience, for equal and exact justice, and, after all the serious consideration of which I am capable, I have recorded my judgment that the amount charged by these attorneys is reasonable and just, and ought to be paid.

"My reasons for this conclusion I will now briefly state:

"(1) Shortly after these opponents sued to have their mother (Mrs. Pons) interdicted she was kidnapped whilst returning from one of her usual daily drives, and forcibly taken from her own home, and delivered to one of them, where she was deprived, if not of her liberty, certainly of her usual comforts and enjoyments.

"A system of annoyances, amounting to malicious mischief, was also put in operation against her home, such as cutting the phone and light wires, etc.

"Under all this the condition of Mrs. Pons became rapidly worse. Hardly a day passed during the many weeks of her forcible detention from her home that these attorneys did not confer with me, as judge, earnestly requesting that I interfere and restore her to her home, put her in the care of her daughter, who lived with her, with her own servants and trained nurses and a physician of her own sex, to minister to her, and police guards to protect her and her home from intrusion and annoyance.

"When finally I acted, and compelled her return to her own home, she was almost in a dying condition.

"I am satisfied, if her attorneys had not secured this judicial action from me, that death would have ended all her troubles in the spring of 1913, less than six months after the interdiction suit was filed.

"After her return to her own home, under the protection and care that was secured for her by her attorneys, she grew rapidly better, and lived in comfort and happiness until her death, in September, 1915.

"It is not an overstatement to say, as the result of the foregoing, that these attorneys saved her life, and gave her the security and comforts of her own home, and all the happiness that was possible, under the circumstances, during the last thirty months of her existence.

"If they had done nothing more for her, considering her estate of $343,100.79, their fee of $30,810, it seems to me, would not be excessive.

"(2) As soon as Mrs. Pons was returned to her own home after her kidnapping and forcible detention of nearly two months, the plaintiffs made systematic attempts to again have her taken from her home, and put in a public sanitarium or retreat.

"This began by representations and suggestions to that effect, accompanied by the recommendation of at least one of their expert physicians.

"When this was refused, habeas corpus proceedings, to effect the same purpose, were taken before Judge Parker of division D of this court, before the Court of Appeal, with final application to the Supreme Court; all of which failed.

"Process to force her attendance at court as a witness by attachment was persistently applied for, with the purpose, as it seemed to me, to harass and worry her, in her feeble condition, and, if possible to break her down.

"The record shows all this, and that throughout these attorneys were active in her defense and protection, and were successful.

"(3) Another weighty consideration is found in the fact that these attorneys defeated the interdiction.

"Mrs. Pons, after near three years of litigation, died free from any decree of interdiction.

"The judgment of the district court was in her favor, dismissing the plaintiffs' suit.

"It is true that that judgment was set aside, and the case was remanded, but this was on the bill of exceptions of these attorneys, complaining that the judge had refused to hear testimony in her behalf, offered to prove that, when the interdiction suit was brought, she was mentally and physically as well as she had been for years; that she was not a subject for interdiction, and that the pitiful condition in which the learned experts found her was due to the distress caused by the suit of her daughters to interdict her, accompanied by the sequestration of her estate in the hands of an administrator pro tempore, and followed by her violent kidnapping and forcible detention away from her own home.

"This was the theory of the defense, pleaded by these attorneys in their answer, and never lost sight of by them at any time during the litigation.

"That it impressed the justices of the Supreme Court is shown by the opinion * * * and the order remanding the case and directing the district judge to hear the offered and excluded witnesses, and to determine whether or not at the time the suit was brought the mental and physical condition of Mrs. Pons was such as to justify her interdiction.

"I had sustained the plaintiffs' objection, and excluded the offered testimony, because, on all the evidence that the plaintiffs had brought, there was shown no necessity for the interdiction, and, according to the jurisprudence, this was an essential condition, sine qua non, as settled in the case of Francke v. His Wife, 29 La. Ann. 302, and Interdiction of Watson, 31 La. Ann. 759.

"It was against the most earnest insistence of these attorneys for Mrs. Pons that I sustained the plaintiffs' objection and ruled out the evidence offered by them.

"They were right, and the judge was wrong, was the judgment of the Supreme Court, and it was on their bill of exceptions that the case was remanded.

"When the trial was reopened in the district court, they produced the excluded testimony.

"They established her mental capacity to make

her last will and testament so completely that when she died there was no opposition to its probate and execution, and her succession has been administered, and is in the last stages of settlement, under that last will and testament, whose date was not long prior to the suit for the interdiction, and whose execution by Mrs. Pons was alleged by the plaintiffs as a ground for her interdiction.

"These attorneys brought witness after witness, and by them established facts that were sufficient to defeat the interdiction suit.

"The court's vacation interrupted the trial, and before it reconvened Mrs. Pons died.

"I have no doubt that, if she had lived, and the evidence had all been heard, judgment would have followed dismissing the suit to interdict her at the plaintiffs' cost.

"At all events these attorneys were successful during the nearly three years in their defense, and it is my belief that only Mrs. Pons' death prevented final judgment in her favor.

"Successful results enter largely into consideration, when fixing the measure of professional compensation.

"If she had lived, and had obtained judgment rejecting the demand of these opponents, as plaintiffs, to interdict her, I have no doubt that she would have compensated her attorneys by perhaps a much larger amount than they claim, for their successful services in saving and prolonging her life, for freeing her from interdiction, and for restoring to her the free enjoyment and control of her ample fortune.

"All that the voluminous record of the proceedings against her shows justifies, I think, this belief.

"Accurate judgment and skill are equally elements for consideration.

"The diagnosis is the test, with the physician and surgeon.

"The discernment of the vital position for defense or attack, and directing all operations through extended territory, with an eye single to that strategic position, mark the great military leader.

"And so it is with the lawyer.

"His services to his client are best displayed in his ability to grasp the controlling fact, or facts, of the particular case, and to establish these by proofs, knowing that the law, when applied to them, will result in favorable judgment.

"(4) Another consideration that has influenced my finding in their favor is found in the assiduous services rendered in the matter of the provisional administration pending the interdiction suit and after its termination by Mrs. Pons' death.

"The testimony of Mr. Roberts, president of the bank that was the administrator pro tempore, shows that he continually conferred with Mr. Fourchy in all matters, great and small, affecting the estate of Mrs. Pons. There was no detail, from the ratproofing of houses to the renewal of the large mortgage resting on one of the properties, in the adjustment of which Mr. Fourchy was not a participant, acting in behalf of himself and Messrs. Woodville & Woodville.

"And on their opposition to the final account of the administrator pro tempore their services cut down the fees and expenses charged against Mrs. Pons' succession by some $15,000.

"Taking all these facts and matters suggested by the record, and applying those principles which jurisprudence has established for fixing the compensation due for professional services, I have found that the amount charged is reasonable, and that it has been honestly earned."

2. By a written obligation of date December 30, 1910, Mrs. Pons bound herself to pay Mr. Fourchy $5,000 a year for five years "as a retainer" for services such as he had previously been rendering, and which were not to include those of a professional character in the courts of the state or elsewhere. At the time of the institution of the suit for interdiction he had received $5,000 as in full for the year ending December 30, 1911, and $1,500 on account of his salary for the year ending December 30, 1912. However, when on November 27, 1912, the order was made appointing the administrator pro tempore, he immediately, and for reasons which were satisfactory to himself and entirely creditable, turned over to that official without protest the business to which he was thus attending and the papers relating thereto. Nor does it appear that he thereafter complained that it had been taken from him. To the contrary, he rendered great assistance to the administrator (one of the banks) until the death of Mrs. Pons, nearly two years later, and, as her executor, litigated with the administrator and its attorneys concerning the compensation to be allowed them, the aggregate amount of which was fixed by this court at $15,000, being a reduction of $15,000, from the amount claimed.

We are of opinion that the proper time for Mr. Fourchy to have asserted his right to render the services and demand the compensation in question was when the administrator was appointed and was demanding to be

paid, and that it is now too late for him to claim from the succession compensation for services understood to be rendered by him without charge to the administrator. The judgment appealed from allowed him $3,500 as balance due for the year ending December 30, 1912. Counsel for the heirs contend that the amount should be reduced to $3,083.33, and we adopt that view.

3. On April 14, 1913, Mr. Fourchy and his associates engaged the services of Drs. O'Hara, Pothier, and Mioton, as expert alienists, to aid them in their defense of the then pending suit, under a written contract reading, as to the terms, as follows:

"In consideration of said employment, said Fourchy, agent and attorney in fact, agrees to pay to said O'Hara, Pothier, and Mioton the sum of $1,200, to be divided between them, and, in the event that said interdiction proceedings are dismissed by judgment in favor of said Mrs. Pons, then the said * * * agent * * * agrees to pay * * * an additional sum of $1,800 to be divided between them. In case said interdiction proceedings are abandoned by plaintiffs, * * * then the sum of $3,000 shall thereupon become due and payable, or, in case said * * * proceedings shall be decided against said Mrs. Pons by final decree or judgment declaring her interdict, the sum of $1,200 shall be * * * payable, when the judgment shall become final."

The interdiction proceedings having abated by reason of the death of the defendant, we are of opinion that the Messrs. Doctors are entitled to $1,200, to be divided between them, and that the $1,500 allowed by the judgment appealed from should be reduced to that amount.

Dr. O'Hara was called in consultation by Dr. Mayo, who was placed in charge of Mrs. Pons after the kidnapping affair, and paid an estimated number of visits for which he claims $1,000, at the rate of $10 per visit. The judgment appealed from allows him $500 for his services in that capacity, and we find no sufficient reason for making any change in that amount.

5. Mrs. Antoinette Pons Suarez, daughter of Mrs. Pons, and one of the two heirs to whom one-third of her estate was bequeathed as an extra portion, was placed on the executor's account as a creditor in the sum of $3,000 "for care and services in interdiction suit." But Mrs. Suarez and her family lived at the house and at the expense of Mrs. Pons before and after the institution of the interdiction suit; Mrs. Pons was provided, at her own expense, with all the servants and nurses and medical attention that she needed; and it is not suggested that she ever agreed, or was asked to agree, to pay Mrs. Suarez anything for such care and attention as she received from her, which might very well have been assumed to have been bestowed from filial affection, and which were abundantly recognized in the last will of the decedent. The claim was properly rejected.

6. The heirs opposed two items placed on the account, among the assets, and reading, respectively: "Amount due by W. A. Pons, $2,670.50," and "Amount due by Mrs. Blanche Longue, $1,594.29," and the opposition was maintained, in accordance with what appears to have been intended as an agreement to that effect, but which seems to be so unfortunately worded, or taken down, as to leave room for some question upon the subject. In making his ruling at the time, however, the judge said:

"On the matter just referred to, I don't think there can be any doubt that that would be a matter of settlement between the heirs, and, for that reason, whatever they are to receive after the payment of all debts and charges is something that would not concern the executor unless he had paid it."

The judgment maintains the opposition of the heirs, including Mrs. Veazey and the children of Mrs. Ruiz, as well as W. A. Pons and Mrs. Longue, and orders the items in question to be stricken from the account, without prejudice to the rights of the heirs of Mrs. Pons as to said matters, and, we think, may properly be affirmed as to said items.

It is therefore ordered that the judgment appealed from be amended by reducing the amount allowed P. L. Fourchy, agent, from $3,500 to $3,083.39, and the amount allowed Drs. O'Hara, Mioton, and Pothier from $1,500 to $1,200, and, as thus amended, affirmed, the costs of the appeal to be paid by the succession.