Rockingham, }
March 6, 1928. }

THEODORE F. HARVEY, *Ex'r*, *v.* ISABELLE F. PROVANDIE.

*George R. Scammon* and *William H. Sleeper* (*Mr. Sleeper* orally), for the plaintiff.

*Burt R. Cooper* and *Gardner S. Hall* (*Mr. Hall* orally), for the defendant.

MARBLE, J.  At the time of the transaction in question the decedent was eighty-two years of age.  He had never been married, and until 1923 had lived for the greater portion of his life either alone or with his unmarried brothers at the family home in Not-

tingham. He was eccentric and illiterate. So far as financial matters were concerned he had always been penurious and close-fisted. He died December 20, 1924. He made his will on June 15, 1921, leaving his property to various nephews and nieces. The plaintiff (a nephew) is the executor named in the will.

For some years prior to 1916 the defendant had been a saleswoman in Boston. In 1916 she came with her husband to Brentwood. Here they purchased a small farm, and ran it for three years. Her husband had been engaged in the clothing business, but ill health had made a change of occupation advisable. By the year 1919 his health had materially improved. Thereupon he and the defendant ceased farming and opened a dry goods establishment at Epping. A grain store was located at the rear of the premises, and the defendant in addition to her other duties waited on customers there. The decedent frequently purchased grain. The defendant met him in 1920. She testified that he was accustomed in good weather to come to the store about once a week. In 1922 she first learned that he had property.

During the summer and autumn of 1922 she sent him by parcel post numerous gifts of food. The postman testified that he acted like a child when the parcels were delivered to him. The defendant was still occupying the farm at Brentwood, and in the summer of 1923 it was tentatively arranged that the deceased should later come there to board. In the autumn the defendant's husband secured a position in Boston. The dry goods business was sold on October 23, and a week later the defendant called on the deceased, stating that she had come to see if he had changed his mind, and that if he had, she was going to Boston with her husband. As a result of this call the decedent left his home on November 1, and went to live with the defendant.

In March, 1924, he procured his bank books, which had been in the custody of a niece, and on April 17 transferred one of them, which contained a balance of approximately $2,600, to the defendant.

There was evidence that he failed markedly during the summer, and that he was very feeble both physically and mentally. He was suffering from several severe maladies. Numerous witnesses expressed the opinion that he was incapable of transacting business.

On December 15 the defendant went to a neighboring city and engaged the services of an attorney. The attorney came to Brentwood the following day and prepared the transfers which are the subject of this controversy. Savings-bank deposits and bonds

aggregating $12,862.73 were transferred to the defendant. A bank account of $3,510.16 was assigned to the plaintiff, in his individual capacity, and one of $3,871.16 to Charles B. Harvey, another of the decedent's nephews, who was also a legatee under the will. Neither of these nephews was there or knew what was being done. The deceased also gave the defendant a bill of sale of his "furniture, tools, wagons, horse and cow."

The defendant was present when the transfers were made and helped to guide the decedent's hand while he was executing the documents in question. The deceased was in bed at the time, and died four days later.

The plaintiff introduced much evidence on the issue of mental incapacity. A witness who had known the decedent for twenty-five years testified that he saw him and spoke to him several times during the summer of 1924, and that he was pale and feeble. The witness said: "I doubted if he recognized me the last time that I spoke." A witness who called on the deceased a month before his death testified: "I stepped in . . . and asked if he knew who this was and he said he didn't." Another witness, who saw him at about the same time, declared that he was weak and tottering and that his eyes had a vacant, staring look. A grocer, who had seen him every few weeks during the last twenty years of his life, testified that on his last few visits to the store he seemed to be shaky and sleepy; that on one occasion his age had been mentioned and he had apparently forgotten the year of his birth. Referring to his last visit, the witness said: "He was a decrepit, bent-over, shaky, weak old man. His speech was slow and if you asked him a question you would kind of have to wake him up."

With respect to the decedent's customary attitude toward his property, a merchant who had been acquainted with him for twenty-five or thirty years stated that money was "almost his God" and that he "was always very afraid that he might lose it." Another witness testified: "I should think from what I observed of him that he would hang onto the last cent." A physician, who had known him for thirty-five or forty years, testified: "He was penurious. It seemed as though he loved a dollar better than his soul in years gone by." Some of the defendant's witnesses testified to the same effect.

Among the various witnesses who expressed the opinion that the decedent was incapable of transacting business were two physicians, one of whom had treated him during the last year of his life.

The sufficiency of this evidence to sustain the finding of mental

incapacity cannot be seriously questioned. *Upton* v. *Company*, 81 N. H. 489, 490; *Pevear* v. *Pevear*, 79 N. H. 524; *Roberts* v. *Barker*, 63 N. H. 332; *Young* v. *Stevens*, 48 N. H. 133, 136; *Dennett* v. *Dennett*, 44 N. H. 531, 538.

The evidence was also material on the issue of undue influence (*Patten* v. *Cilley*, 67 N. H. 520, 528); for manifestly less influence is required to dominate a weak mind than to control a strong one. In the case of *Bartlett* v. *McKay*, 80 N. H. 574, on which the defendant relies, there was no evidence of the testator's incompetency, and the opinion expressly differentiates the case from those in which such evidence can be found. No question of mental incapacity was raised in *Albee* v. *Osgood*, 79 N. H. 89; and in *Loveren* v. *Eaton*, 80 N. H. 62, so far as the execution of the will was involved, there was a special finding that the testator was of sound mind. It is true that with respect to the codicil there was held to be evidence for the jury on the issue of sanity and none on the issue of undue influence. But the most that the evidence on that issue tended to show was "the opportunity and possibly the ability to influence the testator," while here there is substantial evidence not only of opportunity and ability, but of design and accomplishment.

The defendant testified that she became acquainted with the decedent in 1920 and that he came regularly either to her place of business or to the grain store. It is significant that although she had known him for two years she did not begin to send gifts to him until after she had been apprised of his financial means in 1922.

There was evidence that he was on good terms with his relatives and had been asked to live with them. For many years he had had dinner twice each week at the home of a niece, but ceased taking any meals there after going to Brentwood. In the opinion of the niece he did about what the defendant wanted him to do. The defendant expected "to get other than board" from him. She declared that she "didn't take him for love" and claimed that he had promised to give her "most of what he had." To the inquiry, "You were looking after Mrs. Provandie?" she answered: "Indeed I was." It could be found that on various occasions when she had taken the deceased to Exeter she had importuned him to go to a lawyer's office and have his property conveyed to her. She knew of the existence of the will, but said nothing about it to the attorney who was finally employed.

She made all preliminary arrangements for transferring the property. She procured the pen and ink and produced the bank books

from a locked box. The decedent informed the attorney that she would tell him what was wanted. She was present when the documents were signed, and guided the decedent's pen. The attorney twice asked the decedent if he wished to give the defendant his bonds, and he made no reply. Whereupon the defendant reminded him that they had talked the matter over the day before and that she had then said he could have the interest on the bonds as long as he lived. The transfer was then made. The only consideration was the defendant's oral promise to support him.

The fact that certain bank books were assigned to two of the decedent's nephews does not necessarily denote the absence of coercion. Under all the circumstances the jury may well have believed that the defendant encouraged or even suggested these gifts in order that the entire transaction might more convincingly appear to be the decedent's voluntary act.

There is much further evidence of the same general tenor, but it does not seem necessary to recount it, since the evidence already referred to is more than sufficient to sustain the finding. *Pevear* v. *Pevear*, 79 N. H. 524; *Edgerly* v. *Edgerly*, 73 N. H. 407, and cases cited. The motion for a nonsuit was correctly denied.

The defendant also excepted to the exclusion of certain proffered evidence.

One of the plaintiff's witnesses, a physician, testified that he called to see the deceased professionally on December 9. On cross-examination he stated that he had treated other patients at the defendant's home, and said: "I think I visited another man there at the time he [the decedent] was there." The plaintiff objected to "going into the other cases." The court then asked defendant's counsel on what issue he deemed the evidence material. Counsel suggested that the jury "ought to be privileged with as full a setting as possible." Later the defendant testified that her father was sick at her home during the summer of 1924 and that he died September 15. She offered to show the amount of care and attention he required. Testimony was also offered as to declarations of the deceased regarding a financial transaction with a relative who was not a party to the suit and as to his declarations regarding a former will, in which a woman with whom he had once boarded was alleged to have been named as a legatee. Statements of the deceased as to contemplated changes in this earlier will were also offered. Since the trial court found either expressly or impliedly that all this evidence was too remote to be of value, the exception to its exclusion presents nothing

for consideration here. *Cobb* v. *Follansbee*, 79 N. H. 205, 206; *Cross* v. *Company*, 79 N. H. 116, 120, and cases cited; *Kier* v. *Parks*, 79 N. H. 67, and cases cited. This is equally true of the exception to the order confining the evidence of the decedent's sanity to the period subsequent to 1921, since it was conceded that he was of sound mind prior to that date.

The defendant also offered to prove that Charles B. Harvey, on the day of the funeral, when told of the decedent's gift to him, said: "Well, I don't care what Uncle Charles has done with his property; whatever he did I know he wanted to do, and I am glad for whatever I got." Also that the plaintiff at the same time declared: "I knew last September that there was something like this." The defendant also claimed the right to inquire of the plaintiff as to whether he had collected the proceeds of the bank account which the decedent had transferred to Charles B. Harvey.

It is the defendant's contention that the above-quoted declarations were admissible as the admissions of parties. Such admissions are to be distinguished from statements against interest made by persons who are not parties. It is not essential that an admission be contrary to the interest of the party at the time it is made: it is enough if it be inconsistent with the position which the party takes either in pleadings or at the trial. *Masterson* v. *Railway, ante,* 190, 193. But Charles B. Harvey is not named in the list of plaintiffs-in-interest enumerated in the writ, and it is evident that he is not a party unless his interest as legatee makes him such. The admissions of a legatee, however, cannot be used to bind a co-legatee. *Gibson* v. *Boston,* 75 N. H. 405, 408; *Carpenter* v. *Hatch,* 64 N. H. 573, 576. And while it is true, as the defendant suggests, that this rule has been invoked hitherto only in cases where the validity of a will has been attacked, the usual features of a will contest are here presented, and no good reason has been advanced for not applying the rule to the present case. But the question need not be decided, since the ruling of the court can be sustained on other grounds. Charles B. Harvey did not testify, and his declaration was offered as "bearing upon his attitude whether he thought" the decedent "was capable or not." It does not appear that the alleged remark was based upon recent observation of the decedent or upon adequate knowledge of the situation, and the presiding justice may have found as a preliminary fact that it could afford the jury no assistance.

The plaintiff's statement that he knew in September "there was something like this" would naturally imply suspicion of the defendant

rather than belief in the competency of the deceased. But even if the statement were an admission it could not be received against the plaintiff as representative of the legatees. *Gibson* v. *Boston, supra; Moore* v. *Butler,* 48 N. H. 161, 170.

Assuming that the defendant was entitled to an answer from the plaintiff as to whether he had "collected the money under the order" directing payment of the bank deposit to Charles B. Harvey, no harm was done the defendant by excluding the answer, since the plaintiff had already testified that he had neither the order nor the money which it called for. *Wright* v. *Woodward,* 79 N. H. 474, 477.

A physician testifying for the defendant, was asked by defendant's counsel if certain hypothetical circumstances indicated "unsoundness of mind" on the part of the decedent. The court interpreted the question as calling for knowledge which the witness did not profess to have as to "the legal rule of sound mind," and properly excluded the answer. "Lord Eldon has the credit of originating the phrase, 'of unsound mind,' and it is a legal, not a medical, phrase." *Francke* v. *His Wife,* 29 La. Ann. 302, 303, 304; Taylor's Medical Jurisprudence (12th *ed.*), 701.

The defendant requested the court to charge that the evidence was "conclusive as to the performance of all necessary legal formalities" in the execution of the various transfers to her. The only issues submitted were those of sanity and undue influence. No claim was made that any formal requisite had been omitted, and if such a claim had been made, the subsequent findings would have rendered it immaterial. When once the jury had determined that the decedent was of unsound mind and that the defendant had obtained her gift by undue influence, a verdict for the plaintiff followed as a matter of course.

Several instructions were requested to the effect that if the decedent were mentally competent to make the gifts to the plaintiff and to Charles B. Harvey he was competent to convey his property to the defendant. No claim was made that the jury were not correctly informed as to what constituted mental unsoundness. If by her requests the defendant meant to imply that the application of the rule did not vary with varying circumstances, she was clearly in error. *Dennett* v. *Dennett,* 44 N. H. 531, 538, 539. In any event it could serve no legitimate purpose to permit the jury to apply the rule given them to gifts which were not the subject of the litigation.

The same treatment must be accorded the request for an instruction that if the decedent was mentally competent to make a will he was mentally competent to make a present transfer of his property. In *Curtice* v. *Dixon*, 74 N. H. 386, it is said that where a person disposes of his estate in view of approaching death the question of his mental soundness is determinable by the rules which would be applied if the disposition had been by will. Here, however, it does not appear that the decedent disposed of his property in view of approaching death. On the contrary, he expected to live, and the defendant promised to support him. The attorney who drew the transfers declared that he "had no reason to think that there was any expectation of death." Moreover, no instruction as to what constituted capacity to make a will was requested and no exception taken to that part of the charge relating to unsoundness of mind. In point of fact the conventional instructions applicable to will cases were given. Under such circumstances the defendant cannot complain.

Two of the requests were virtually motions to direct a verdict on each of the issues involved.

There were other requests asking for a ruling that certain acts of the defendant and the decedent were not evidence of undue influence. While some of these acts standing alone would not constitute sufficient evidence on that issue, taken collectively they had definite probative value. The presiding justice so treated them.

The request that proof of entreaties and importunities was not sufficient to establish undue influence unless the decedent's will was overpowered thereby was substantially covered by the charge. It was not necessary to adopt the phraseology of counsel. *State* v. *Mannion*, 82 N. H. 518, 526, and cases cited.

The defendant further requested the court to charge that the fact that the decedent was physically infirm and mentally weak gave rise to no presumption of undue influence. Like requests were made with respect to his age and illiteracy. The court stated that a gift by a person old and feeble and easily influenced to one in attendance upon him might be viewed with suspicion (*Edgerly* v. *Edgerly*, 73 N. H. 407), but that on examination it might be found to be perfectly natural and proper; that if the donor, though ill and feeble, made the gift of his own free will and accord it was good; that no hard and fast rule, no definite test, could be applied, but that all the circumstances surrounding the act were to be taken into account.

The instructions on the issue are too extensive to be quoted in full. It is enough to say that the subject-matter of the requests was treated with substantial accuracy and without exception and that the entire charge was sufficiently favorable to the defendant. *Gaffney* v. *Coffey*, 81 N. H. 300, 307.

Defendant's counsel, by means of a memorandum placed on the judge's desk after the time for making requests had expired (Rule 52, 78 N. H. 697) asked the court to charge the jury as follows: "The citation of the defendant by the probate court for embezzlement has no weight or bearing on this case; in other words, is not evidence and must be excluded from the jury's mind as to defendant's responsibility."

A judge who waives the rule and receives a belated request should not be required in the short time allowed him for its consideration to scrutinize it for hidden meanings. It should at least be clear and definite enough so that he may give it *verbatim* without danger of misleading the jury.

The defendant had testified without objection that she had been cited to appear before the probate court for embezzlement (P. L., c. 301), and that she had appeared there and given her testimony. Plaintiff's counsel used this testimony freely for the purpose of contradicting her. The citation was not of course evidence that the defendant had committed a crime. *Scott* v. *Knight*, 67 N. H. 500; *Dodge* v. *McNeil*, 62 N. H. 168. But the language of the request was too ambiguous to constitute a proper instruction. The only inference that the jurors could reasonably have been expected to draw from it would have been that the entire examination in the probate court was without weight or bearing and that they must exclude from their minds the evidence which had been elicited on that examination. The situation differs essentially from that in *Burke* v. *Railroad*, 82 N. H. 350, 361, where the general purport of the instruction desired was plainly and seasonably brought to the attention of the court. Here, according to the defendant's brief, an instruction was desired defining "what the term 'embezzlement' means when used in connection with probate practice," and it cannot be said that any such desire is manifested by the words of the request.

This exception has been considered because it is included in a list of exceptions attached as an appendix to the bill of exceptions, which the presiding justice has approved. It does not clearly appear, however, that the presiding justice waived Rule 52 at the time

of the trial, or that the defendant's exception to his refusal to grant the request was then allowed.

*Judgment on the verdict.*

SNOW, J., did not sit: the others concurred.