Hillsborough, }
March 1, 1932. }

STATE *v.* ARTHUR H. HALE.

*Ralph W. Davis,* attorney-general, *John L. Sullivan,* solicitor, *John R. McLane* and *John P. Carleton* (*Mr. Davis* orally), for the state.

*Warren, Howe & Wilson* and *Murchie, Murchie & Blandin* (*Mr. Robert C. Murchie* orally), for the defendant.

MARBLE, J.   The various counts on which verdicts of guilty were returned relate to separate mortgage-loans, all embraced in a comprehensive transaction involving the development of land in Colorado. Although the record is extremely voluminous, the evidence pertinent to the defendant's motion for a directed verdict may be briefly summarized.

On September 16, 1925, one Charles E. Gibson, through whose real estate agency loans aggregating substantially a million dollars had been made by the Merrimack River Savings Bank on land situated in or near the San Luis valley, wrote a personal letter to the defendant reminding him that "a large proportion of" the loans "were accommodation mortgages on which there" was "no one to pay the interest but the Gibson Co.," and notifying him that that company had reached the end of its resources.   The defendant had been informed two years earlier that farms in the region were being abandoned, that the value of the property was becoming undermined, and that the outlook was depressing.

Although it was the policy of the bank to restrict its investment in any specific type of security to one million dollars, the defendant made no attempt to liquidate the Colorado holdings, but continued to advance bank funds to the Gibson company, secured by mortgages on the lands already mortgaged, until the total amount loaned thereon exceeded the sum of two million dollars.

To conceal the fact that the Gibson company was interested in these additional loans the defendant engaged the services of the Morris Land Company of Lawrence, Kansas. Gibson conveyed his lands to straw men, who mortgaged them nominally to the Morris company but actually to the bank. The Morris company's endorsements were without recourse. All papers were sent at once to Gibson and by him forwarded to the defendant, and all checks sent by the defendant to the Morris company were turned over immediately to Gibson. This method was pursued until the Morris company, discovering that some of the loans were "excessive and entirely out of reason," refused to continue the arrangement longer.

The remaining loans, totalling nearly a half million dollars, were negotiated in the name of the Colorado & New England Mortgage Company, a corporation organized in accordance with the defendant's express directions and conducted by Gibson and his associates.

On each loan made after 1925 the defendant received a bonus of approximately twenty per cent. And while he contends that these bonuses were eventually paid to the bank, this is true only in the sense that he used the money so acquired to reduce or discharge obligations due the bank for which it could be found he was either directly or indirectly responsible. There is much further evidence including false appraisals, certificates and reports, and letters written by the defendant to Gibson suggesting a fictitious address for the Colorado & New England company and enjoining secrecy and concealment, all tending strongly to refute the defendant's assertion that his only error was an honest mistake of judgment. However, it is unnecessary to discuss this evidence at length, for a fraudulent intent may be inferred from circumstances (*Cavanaugh &c. Inc.* v. *Barnard,* 83 N. H. 370, 372), and the facts already noted are clearly sufficient to justify the denial of the motion.

The defendant also moved to quash the indictment for duplicity. The fact that each count charges the defendant with the minor and incidental offense of making illegal investments (P. L., c. 262, s. 3, cl. II) does not render the indictment objectionable on that ground. *State* v. *Gorham,* 55 N. H. 152, 163, 164, and cases cited. See also *State* v. *Shaheen,* 81 N. H. 194, 195.

It was within the discretion of the trial court to permit counsel other than those acting under the authority of P. L., c. 16, s. 11, to assist the attorney-general in the trial of the case. 18 C. J. 1343 and cases cited; 1 Bishop, Criminal Procedure, s. 282.

The defendant denied that he had misappropriated the bonuses paid to him by Gibson, and sought to prove that the bank was in reality his debtor. This extended the scope of the trial to include a meticulous investigation of the defendant's financial affairs. As a consequence, the problems presented were largely those of remoteness determinable by the presiding judge. *Cobb* v. *Follansbee*, 79 N. H. 205, 206. This is true with respect to such exceptions as those relating to the admission and exclusion of opinion evidence, to the exclusion of evidence in disparagement of witnesses, and to the exclusion of evidence concerning the custom of certain Massachusetts banks. See *State* v. *Hause*, 82 N. H. 133, 136; *State* v. *Hersom*, 84 N. H. 433, 434; I Hening's Digest, *p.* 585.

Similarly, the exceptions collected in the defendant's first supplementary brief under the topics entitled "The admission of irrelevant evidence," "Evidence inadmissible because remote," "Excluded documents," and "Evidence of value of lands subsequent to the date of the mortgages," raise no questions of law. In considering the multitude of exceptions of this nature it is sufficient to state that in no instance is any abuse of judicial discretion apparent.

It was the state's contention that the notes on which the Gibson bonuses were applied were notes in which the defendant had a personal interest either because he had received compensation for obtaining approval of the loans (a fact which he obviously desired to conceal from the bank) or because they were made for his own benefit. The circuitous method by which the Gibson bonuses were disbursed and many of the note-payments made was in itself a suspicious circumstance, and while the state's contention was more convincingly demonstrated in some instances than in others, the evidence as a whole, viewed in the light of this circumstance, plainly justified the conclusion urged. It is not the rule in this jurisdiction that "each evidentiary fact sought to be used by the state must be established beyond a reasonable doubt." *State* v. *Kilcoyne*, 82 N. H. 432, 433. The court committed no error therefore in denying the defendant's motion to withdraw from the jury the evidence relating to certain loans.

The defendant was shown to have received bonuses in connection with transactions other than those directly in issue. There was also evidence of his participation in further irregularities, such as the remortgaging to the bank of real estate the title to which the bank had already acquired by foreclosure. With reference to this class of evidence the jury were instructed in part as follows: ". . . any or all of

those transactions not specifically in the indictment are no evidence of the defendant's guilt or innocence, except as they may help you in ascertaining his intent at the time he made the loans referred to in the indictment." As thus limited, the evidence was unquestionably admissible. *State* v. *Hinton*, 84 N. H. 75, 83; *Land Finance Corp'n* v. *Company*, 83 N. H. 518, 522, and cases cited.

Defendant's counsel requested a witness to look at a photograph he had taken, and then from his "or Mr. Wadleigh's memoranda" tell what count described the land. The witness, referring to his own penciled notes of memoranda made in collaboration with Mr. Wadleigh, answered the question. Counsel then said: "I now add to my objections to the introduction of these photographs the further objection, the witness is testifying from memoranda made by some one else." The notes referred to were not introduced in evidence, nor were their contents read to the jury. So far as appears the witness' recollection was actually revived. See *Kelsea* v. *Fletcher*, 48 N. H. 282. Under such circumstances, the authorship of the memoranda was entirely immaterial, nor was it essential that the original be used. 2 Wig. Ev. (2d. *ed.*), *ss.* 759, 760.

Whether this and other photographs introduced as exhibits were sufficiently authenticated was a question for the presiding justice to determine. *State* v. *Mannion*, 82 N. H. 518, 520.

The witness Gibson was asked on direct examination "how many units of land" he had purchased from the defendant in 1909 and the "aggregate amount of mortgages" he had turned over to the defendant in 1914. The mortgages were not in the witness' possession, but had been "surrendered to Mr. Shahan, the maker of the paper," in Colorado. Another witness was asked "to whom a mortgage" of certain Massachusetts real estate ran. It is doubtful if these questions may fairly be said to refer to the "contents" of written instruments, as claimed by the defendant, but even if they do so refer, the presiding justice, having found on sufficient evidence that the documents were beyond the jurisdiction of the court, could properly admit the oral testimony. *State* v. *Wren*, 77 N. H. 361, 363, and cases cited. Nor was it a violation of any rule of evidence to permit a mortgage broker under cross-examination by the state to show by his own records the details of a transaction he had had with the bank.

On cross-examination, defendant's counsel asked a witness to state the "census figures" with respect to the increase in the number of farmers in the San Luis valley. It was proper for the attorney-general to continue the subject thus introduced by inquiring: "What was the

minimum acreage in that census report, if you know, that was counted as a farm?" There are other instances in which evidence became admissible on cross-examination under similar circumstances.

The defendant complains that the court by excluding certain evidence relating to the fertility of the San Luis valley failed to give him the same latitude in cross-examination that the state enjoyed. This evidence was offered very early in the trial. In ruling it out at that stage of the proceedings the court said: "If it is found material when you get to your part of the case, you can, of course, put it in." This ruling was eminently fair.

The attorney-general asked one of the trustees of the bank, called by the defendant, if it had ever been brought to his attention that the farmers were leaving the property in droves. The defendant excepted on the ground that the attorney-general was testifying. The question was asked in an effort to discover the extent of the witness' knowledge of the Gibson loans and was merely a quotation from a letter written by Gibson to the defendant in 1923. Since the witness appeared doubtful as to whether or not this letter had been shown to him, the cross-examination was legitimate. It was also proper for the attorney-general to make use of the same quotation when cross-examining the defendant.

The attorney-general's exclamation, "Right!", following one of the defendant's answers on cross-examination did not constitute testimony in any true sense of the term. "While comments of this character are not to be encouraged" (*Sanders* v. *Railroad*, 77 N. H. 381, 383), their significance is ordinarily of too little weight to render the trial unfair. *Jordan* v. *Railroad*, 80 N. H. 105, 107, 108; *Sanders* v. *Railroad*, *supra*, and cases cited.

The defendant testified on direct examination that he had not "declined to talk with anybody representing the state" since June 9, 1930 (the date on which the bank was closed), and "had answered all questions they" had asked him. On cross-examination the state inquired if he had received a letter dated June 23 suggesting that the attorney-general wanted him "to have an opportunity to explain things that looked irregular before any action was taken." The defendant declared that he did not remember the letter. It was later produced by defendant's counsel, but excluded on the ground that it had not been properly identified. The defendant, having taken the witness stand, waived his privilege in its entirety. *State* v. *Fogg*, 80 N. H. 533, 535. The preliminary facts on which the admissibility of the letter depended had to be proved as other facts are proved. See

*Dunklee* v. *Prior*, 80 N .H. 270. The attorney-general did not read the letter to the court or to the jury, nor did he exceed the bounds of propriety in endeavoring to show that the defendant had received it.

An accountant, called by the state, was asked by defendant's counsel "from what source" the firm of which he was a member received its pay. The witness answered: "I believe it is in checks drawn by the state treasurer." Whereupon counsel inquired: "How much have they amounted to, to date?". And the witness replied: "I couldn't tell you." After some discussion counsel then said: "I want to find out who in your partnership would know what your partnership is paid by the state of New Hampshire and how much was paid." The defendant's contention that the exclusion of this evidence constituted a clear abuse of discretion is not borne out by the record. The court ruled that since the witness himself could not say how much had been paid his firm, it was not "worth taking time" to pursue the subject further. Counsel was then permitted to show by the witness that thirty-five dollars a day was the sum charged for his services.

The same witness was asked by defendant's counsel if, in the course of his investigation, he had found out that H. C. Spiller & Company, brokers, had sold bonds received from the defendant, "at times returning the proceeds to him and at times using the proceeds to pay interest payments on loans of the Merrimack River Savings Bank placed through Spiller." The records of Spiller & Company were not in evidence, although the witness had examined them. The evidence was offered "to impeach the credibility of this witness" who had testified that he had "tried to trace the money from Spiller's hands." The state did not object to the question if permitted in turn to interrogate the witness concerning the records in question. The defendant refused to waive his right to object to any further examination of the witness by the state unless the records were produced, and the evidence was excluded. The ground on which the presiding justice based his ruling seems unexceptionable. He said: "You asked this witness a general question, what he found out from the Spiller records. In my judgment, that opens up what is in the Spiller records. If you want to put it in that way, there is no objection." See *State* v. *Mannion*, 82 N. H. 518, 525; *Keefe* v. *Railroad*, 78 N. H. 139, 141. The fact that the evidence was offered merely on the issue of credibility did not alter the rule, nor could the defendant by calling for a categorical answer limit the field of inquiry. The extent to which the issue should be "opened up" was for the presiding judge.

This he recognized when he said: "If you are going into the thing, what information this witness obtained from the Spiller records, let us all do it. If you don't want to follow that rule, don't."

Moreover, the records in question were later introduced. This removed the objection to the cross-examination, and under our practice the defendant could then have recalled the witness and interrogated him. *Villineuve* v. *Railway*, 73 N. H. 250, 253.

This witness had examined the records of the First National Bank, of which the defendant was president. On cross-examination defendant's counsel inquired at length concerning the contents of these records. On re-direct examination the attorney-general requested the witness to trace the history of the Heath loan, so-called. In the course of his answer the witness stated that a certain entry of $16,000 appeared on the books of the First National Bank. Thereupon defendant's counsel moved that "all evidence of this witness with reference to what the records of the First National Bank show as to the transaction be stricken from the record." The court then asked if the motion covered the testimony "in regard to the records of the First National Bank" elicited on cross-examination, and defendant's counsel replied: "No; I am not asking for any testimony to be stricken from the record except this incompetent testimony which is proposed. I would like the records here, so we may see them when they go in, the records of the First National Bank . . . and I will be in a position to cross-examine." A conference with counsel followed, during which the court said: "We are going to rely on the records . . . Your motion will be granted . . . I will have to tell the jury that when I come back." This the court failed to do, however. After a recess of three days (the national bank records having been produced in the meantime) the witness resumed his testimony. The entry appeared exactly as the witness had stated. If the failure of the court to withdraw from the jury the statement objected to can be deemed an error, it was very obviously a harmless one. No exception was taken, nor does the matter appear to have been called again to the court's attention.

There was no inconsistency in the ruling that an accountant might testify that the bank received no benefit from bonuses applied to the payment of loans other than those from which the bonuses were derived but could not testify "as to whether the use of the bonus money to pay the interest on loans of certain individuals discharges the obligations of those individuals to the bank." The testimony in the first instance related to a matter of fact; that in the second instance to a

question of law. And since the witness did not profess to have knowledge on that subject, the answer was correctly excluded. *Harvey* v. *Provandie*, 83 N. H. 236, 243.

Certain exceptions are discussed in the defendant's first supplementary brief under the topic: "Testimonial assertions occurring during altercations of counsel and colloquy with the Court in the presence of the jury." These assertions appear to have been innocuous. The first was addressed to the court in support of an objection which was overruled. Exceptions were freely interjected in the midst of debate between counsel, and in no instance was an exception taken to the "ruling, direction or judgment of the superior court." P. L., c. 315, s. 8. See *State* v. *Ketchen*, 80 N. H. 112, 114; *Tuttle* v. *Dodge*, 80 N. H. 304, 312. The same is true of the exceptions referred to as "Misstatements of evidence."

In his opening statement the attorney-general informed the jury that the state would show that a situation existed in 1925 which if known to the bank commissioner would have caused him, under his duty, to declare the bank insolvent. The defendant excepted, and the presiding justice stated that he should strike what had been said about the bank commissioner from the record. The evidence which the state subsequently introduced justified the statement as a matter of fact. Assuming, however, that no evidence relating to the duty of the bank commissioner was admissible as a matter of law, no error was committed, since the court did not endorse the remark to which exception was taken. *Whitcher* v. *Association*, 77 N. H. 405, 407, 408; *Charrier* v. *Railroad*, 75 N. H. 59, 63.

Of the fourteen alleged misstatements of evidence claimed to have been made by the attorney-general in his argument to the jury "there was no misstatement of any consequence" which was not immediately "corrected by the attorney-general to exact agreement with the evidence." *State* v. *Small*, 78 N. H. 525, 530. Most of the remarks objected to fall within the rule that the existence of evidence tending to establish a fact justifies the assertion in argument that such fact is established. *Piateck* v. *Swindell*, 84 N. H. 402, 404. Moreover, the presiding justice in his charge admonished the jury to "give no consideration to any statement of counsel or court" which was "not borne out and supported by the evidence" as they recalled it. The exceptions to the allowance of argument are accordingly overruled.

The definition of reasonable doubt as given in the charge does not differ in essential respects from that approved in the case of *State* v. *Mannion*, 82 N. H. 518, 526; 389 Briefs and Cases, 1235.

The defendant excepted to the court's instruction that the money of a banking institution would be misapplied within the meaning of the statute if used for any unlawful purpose, even if the misuse did not inure "to the benefit of the party making it." It is now urged that this statement should have been qualified by the explanation that "the misapplication of funds must have been knowingly done." In point of fact, the jury were so instructed; for the court later informed them that the misapplication must have been made "purposely and deliberately, knowing it to be unlawful or unauthorized."

By denying the defendant's motion to set the verdict aside the presiding justice has found in effect that the trial was fair.

*Exceptions overruled.*

All concurred.